**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|                           |     |                 |
|---------------------------|-----|-----------------|
| FACEBOOK, INC.,           | )   |                 |
|                           | )   |                 |
|               Plaintiff,  | )   | No. 11-cv-3052  |
|                           | )   |                 |
|     v.                    | )   |                 |
|                           | )   |                 |
| TEACHBOOK.COM LLC,        | )   |                 |
|                           | )   |                 |
|               Defendant.  | )   |                 |
|                           | )   |                 |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MARVIN E. ASPEN, District Court Judge:

Plaintiff Facebook, Inc. ("Facebook") has filed an eight-count complaint against

Defendant Teachbook.com LLC ("Teachbook") alleging trademark infringement, trademark

dilution, and related federal and state claims. (Compl.) Teachbook moves to dismiss the

complaint for failure to state a claim upon which relief can be granted. (Mot. & Mem.)

Teachbook's motion is denied.

**I. BACKGROUND**

As is always the case with motions to dismiss under Rule 12(b)(6), we look to the

complaint and any supporting exhibits for the facts upon which to evaluate the motion. In this

case, Facebook has filed a fifteen-page complaint and five accompanying exhibits. Normally at

this stage, these materials would provide the sum total of the relevant facts for evaluating

Teachbook's motion to dismiss. But in support of its motion to dismiss, Teachbook has

proffered over 300 pages of additional material that it would like us to consider. Thus, after first

setting out the allegations Facebook makes in its complaint and supporting exhibits, we then determine whether Teachbook's additional material ought to be considered in evaluating the current motion.

### A. Facebook's Complaint

Facebook is a Delaware corporation with its principal place of business in Palo Alto, California. (Compl. ¶ 1.) Since its founding in 2004, Facebook has risen to prominence through its provision of a social networking website and related services. (*Id.* ¶¶ 6, 10–11.) Teachbook is a Delaware limited liability company with its principal place of business in Northbrook, Illinois. (*Id.* ¶ 2.) Teachbook maintains a social networking website targeted specifically at teachers. (*Id.* ¶ 12.)

Facebook is suing Teachbook for infringement of Facebook's claimed statutory and common law trademark rights in "FACEBOOK" and related marks. (*Id.* ¶¶ 7–8, 24–74.) Facebook has been continuously using the FACEBOOK mark since February 2004 and now owns multiple United States Patent and Trademark Office ("USPTO") registrations for it. (*Id.* ¶¶ 6–8 & Ex. A.) Facebook alleges that, "as a result of the nature and quality of Facebook's services, its widespread use of the FACEBOOK Marks, Facebook's enormous and loyal use base, its numerous trademark registrations and pending applications, and other factors, the FACEBOOK Marks are famous[.]" (*Id.* ¶ 10.)

Facebook accuses Teachbook of trading on the fame the FACEBOOK mark has achieved. (*Id.* ¶ 28.) According to the complaint, Teachbook's website has contained the following statement at various times:

> Many schools forbid their teachers to maintain Facebook and MySpace accounts because of the danger that students might learn personal information about their teachers. With

> Teachbook, you can manage your profile so that only other teachers and/or school
> administrators can see your personal information, blogs, posts, and so on.  Teachbook is
> all about community, utility, and communication for teachers.

(*Id.* ¶ 13.)  Based on this statement, Facebook contends that Teachbook is touting itself as a

"substitute for Facebook."  (*Id.*)

Although Teachbook applied to register its "TEACHBOOK" mark with the USPTO on

an intent-to-use basis on March 16, 2009, Facebook has opposed this application.  (*Id.* ¶ 14.)

Facebook asserts that the TEACHBOOK mark is substantially similar to its FACEBOOK mark.

(*Id.* ¶ 15.)  Facebook further claims that the services Teachbook offers under the TEACHBOOK

mark "are the same as and/or related to some of the services provided by Facebook."  (*Id.* ¶ 16.)

In Facebook's view, Teachbook's use of the TEACHBOOK mark also "creates a false

suggestion of an affiliation or connection between [Teachbook] and Facebook, where none

exists."  (*Id.* ¶ 17.)  Notably, Facebook contends that Teachbook "adopted its TEACHBOOK

Mark with the intention of causing confusion with, and trading on the goodwill of, the

FACEBOOK Marks."  (*Id.* ¶ 18.)

Based on these allegations, Facebook initially filed suit against Teachbook in the

Northern District of California on August 18, 2010.  (*Id.* ¶ 20.)  That case was dismissed for lack

of personal jurisdiction over Teachbook, however, on May 3, 2011.  (*Id.* ¶ 22.)  Facebook

subsequently filed this suit against Teachbook here in the Northern District of Illinois on May 6,

2011.  (Dkt. No. 1.)

### B.  Teachbook's Exhibits

In addition to these allegations in Facebook's complaint, which we accept as true,

Teachbook has offered over 300 pages of exhibits in support of its motion to dismiss.

Teachbook claims that these materials are all either referenced in Facebook's complaint or public records subject to judicial notice. (Mem. at 5–6.) Thus, we must address the threshold issue of whether these materials are properly considered in conjunction with Teachbook's motion to dismiss.

In addition to the allegations in the complaint, courts are free to examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" in evaluating a motion to dismiss under Rule 12(b)(6). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 2509 (2007); *Thompson v. Illinois Dep't of Professional Regulation*, 300 F.3d 750, 753 (7th Cir. 2002); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994). But besides this limited class of materials, Rule 12(d) mandates that "[i]f, on a motion under Rule 12(b)(6) or 12©, matters outside the pleadings are presented to and not excluded by the court, the motion *must* be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d) (emphasis added). When a court converts a motion to dismiss to one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*

The question here, then, is whether the materials Teachbook has presented are either "incorporated into the complaint by reference" or subject to "judicial notice." *Tellabs*, 551 U.S. at 322, 127 S.Ct. at 2509. If they are, then we may properly evaluate them under Teachbook's Rule 12(b)(6) motion. If they are not, then we can only evaluate them, if at all, after converting Teachbook's motion to dismiss to a motion for summary judgment and allowing Facebook an opportunity to present any pertinent material. Fed. R. Civ. P. 12(d). We first consider the

materials that Teachbook contends are subject to judicial notice, followed by those that Teachbook contends are referenced in the complaint.

### 1. Judicial Notice

Seven of Teachbook's ten exhibits are materials that it contends are subject to judicial notice. These exhibits consist of a filing Facebook made with the European trademark authority (Mem., Ex. B.); USPTO records pertaining to trademark registrations belonging to Facebook and others (*Id.*, Exs. C–G); and dictionary definitions (*Id.*, Ex. H.). Regarding Facebook's European filing and the USPTO records, Teachbook maintains that these documents are "matters of public record" of which we can take judicial notice. (Mem. at 5.) Teachbook also cites Seventh Circuit authority for the consideration of dictionary definitions in trademark cases. (*Id.* at 6.) Teachbook relies on these documents to argue that "Facebook has judicially admitted facts which undercut its entire complaint" and that Facebook cannot rely on the suffix "-BOOK" to maintain its trademark claim against Teachook. (Mem. at 9–13.)

Teachbook places particular emphasis on Facebook's filing with the European trademark authority. (Mem. at 9–11.) In that filing, Facebook was replying to objections raised by a Spanish holder of the trademark "FACTBOOK" to Facebook's attempt to register "FACEBOOK" as a trademark. (Mem., Ex. B. at 1.) Facebook argued that "the aural and conceptual differences between the marks counteract any existing similarity" between them, and, as such, "likelihood of confusion . . . can be clearly excluded." (*Id.* at 6.) Teachbook urges that this statement and others made in the same document are fatal to Facebook's complaint in this case. (*Id.* at 9.)

Facebook responds that "the evidentiary value of Teachbook's proffered documents are subject to reasonable dispute," which precludes consideration of them at this stage. (Resp. at 5–6.) Facebook also challenges Teachbook's position that its filing with the European trademark authority is a "judicial admission," because the filing was not made in the present litigation. (*Id.* at 6.) Facebook further maintains that the document is irrelevant to this case based on disparate factual and legal contexts. (*Id.* at 6–7.) Lastly, Facebook objects to Teachbook's reliance on dictionary definitions that, in Facebook's view, are of reasonably disputed evidentiary value. (*Id.* at 7–8.)

As indicated, a court may consider facts subject to judicial notice in the context of a motion to dismiss under Rule 12(b)(6). *Tellabs*, 551 U.S. at 322, 127 S.Ct. at 2509; *Doherty v. City of Chicago*, 75 F.3d 318, 325 n.4 (7th Cir. 1996). In order for a fact to be subject to judicial notice, Federal Rule of Evidence 201 provides that the "fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts strictly adhere to these criteria because "the effect of taking judicial notice under Rule 201 is to preclude a party from introducing contrary evidence and, in effect, directing a verdict against him as to the fact noticed." *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997) (citation omitted).

Matters of public record, such as the contents of court records, can fall within this narrow category of judicially noticeable facts. *Id.* at 1082. The reason for allowing courts to consider such records is "to avoid unnecessary proceedings when an undisputed fact in the public record

establishes that the plaintiff cannot satisfy the 12(b)(6) standard." *Id.* at 1081. But in order for a court to take judicial notice of a finding from a previous proceeding in a later proceeding, "[t]he application of [the] previous finding to [the] latter proceeding must be beyond reasonable dispute." *Id.* at 1083.

In *General Electric Capital*, the Seventh Circuit reversed the dismissal of a claim pursuant to Rule 12(b)(6), because the district court had improperly taken judicial notice of its own findings in a prior proceeding. *Id.* at 1076. In the prior proceeding, the district court had approved a class action settlement based on the transfer of 95% of one company's assets to another company. *Id.* at 1078. In doing so, the district court determined that the settlement was "fair, reasonable, and adequate." *Id.* In a subsequent proceeding, a plaintiff who had not been a party in the prior proceeding sought to set aside the transfer as fraudulent under Illinois law. *Id.* The district court took judicial notice of its approval of the prior settlement as "fair, reasonable, and adequate" to determine that the present plaintiff could not state a claim, given that the plaintiff's fraudulent transfer claim required proof that the transfer was not for "reasonably equivalent consideration." *Id.* The Seventh Circuit rejected the district court's use of judicial notice because it "question[ed] the evidentiary value of the earlier approval of a class action settlement in determining whether the transfer was not for reasonable value." *Id.* at 1082. Thus, the application of the earlier finding to the subsequent proceeding was subject to "reasonable dispute" and thus not appropriate for judicial notice. *Id.* at 1083 (citing Fed. R. Evid. 201(b)).

As with the Seventh Circuit in *General Electric Capital*, we "question the evidentiary value" of the documents Teachbook now proffers. *Id.* at 1082. This is not to say that these documents are of no evidentiary value—they may well have some. Instead, we merely conclude

that their evidentiary value is subject to "reasonable dispute." Fed. R. Evid. 201(b). Thus, they are not appropriate subjects of judicial notice.

As Facebook rightly points out, its filing with the European trademark authority occurred in a very different factual and legal context. Although Teachbook describes the filing as a "judicial admission" that is fatal to Facebook's current claim, this characterization is incorrect. (Mem. at 9–11.) A judicial admission occurs "[w]hen a party in a lawsuit makes an admission in its pleadings or in its answer to a request for admissions[.]" *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996). Such an admission "can determine the outcome of that lawsuit." *Id.* But contrary to Facebook's position here, "a statement made in one lawsuit cannot be a judicial admission in another." *Id.* Accordingly, Teachbook's attempt to sound the death knell of Facebook's current claim based on a filing in a foreign jurisdiction is premature. While Teachbook may later be able to point to this filing as evidence, it cannot do so at this stage in the proceedings.

The same is true for the other exhibits of which Teachbook asks us to take judicial notice. These exhibits consist of USPTO records and dictionary definitions. (Mem., Exs. C–H.) Teachbook relies on these exhibits to argue that Facebook cannot state a trademark infringement claim based on Teachbook's use of the suffix -BOOK, because it is generic and unlikely to cause confusion. (Mem. at 11–13.) Once again, however, the evidentiary value of these exhibits in this case is subject to "reasonable dispute." Fed. R. Evid. 201(b); *General Electric Capital*, 128 F.3d at 1083. Facebook challenges the relevance of this evidence, because it is asserting a trademark claim based on FACEBOOK, not just the suffix -BOOK. (Resp. at 11.) Accordingly,

we decline to take judicial notice of Teachbook's proffered USPTO records and dictionary definitions at this stage.

### 2. Documents Referenced in the Complaint

The last three exhibits Teachbook seeks to introduce are printouts from Facebook's website.  Teachbook argues that it is proper to "consider copies of the parties' websites, since they are specifically referenced in the Complaint and crucial to [Facebook's] claims." (Mem. at 6.)  Facebook disputes Teachbook's contention that the exhibits are "central to Facebook's claims." (Resp. at 7.)

It is true that a court may consider documents attached to a defendant's motion to dismiss, where those documents "are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).  For instance, if the plaintiff alleges breach of contract without attaching the contract to the complaint—as the plaintiff is free to do—the defendant may properly introduce the contract or portions thereof as an attachment to a motion to dismiss.  *Id.*; *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718 n.4 (7th Cir. 2003).  The court can properly consider such a document without converting the motion to dismiss to a motion for summary judgment. *Chemtall GMBH*, 320 F.3d at 718 n.4.

But Teachbook's website printouts are not the type of documents that may properly be considered as central to Facebook's claim.  The first exhibit is a printout from the "Press Room" portion of Facebook's website with a text box labeled "About Facebook." (Mem., Ex. A.) While the nature of Facebook's website and business is likely to play a role in this case, Teachbook has not demonstrated that this particular portion of Facebook's website is central to

Facebook's claim. Indeed, allowing Teachbook to cherry pick portions of Facebook's website to introduce via a motion to dismiss simply because the complaint implicates the two websites would convert an examination of the complaint in to full-blown summary judgment analysis. This result would vitiate an otherwise narrow exception to the general rule that a motion under Rule 12(b)(6) stands or falls based on the allegations in the complaint.

The other printouts Teachbook offers from Facebook's website are similarly inappropriate to consider at this stage. One set of these printouts consists of portions of Facebook's website pertaining to Facebook groups—that is, associations of Facebook patrons—for which the name of the group contains the suffix -BOOK. (Mem., Ex. I.) The groups included run the gamut from "Catbook" to "Faithbook" to "Lamebook." (*Id.* at 1–3.) The last exhibit is a printout of another portion of Facebook's website dedicated to the Facebook group named "Hey Facebook, Leave Teachbook Alone!" (*Id.*, Ex. J.) Again, it would be a stretch to describe these exhibits as "central" to Facebook's claim. While these exhibits may have some evidentiary value, they are not the type of crucial documents, such as a contract in a breach of contract claim, that can be introduced as part of the pleadings at the motion to dismiss stage.

Thus, none of Teachbook's ten exhibits may be considered in conjunction with its motion to dismiss under Rule 12(b)(6). The only way we could consider these exhibits at this time would be to convert Teachbook's motion to one for summary judgment. Given that this case involves eight separate although related claims and complex issues of law, we decline to convert Teachbook's motion. Accordingly, the only alleged facts we will consider are those appearing in Facebook's complaint and accompanying exhibits.

## II.  STANDARD OF REVIEW

Having settled what alleged facts we are to consider, we turn to the standard by which we shall consider them.  It is well-settled that a motion to dismiss under Rule 12(b)(6) is meant to test the sufficiency of the complaint, not to decide the merits of the case.  *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990).  A court may grant a motion to dismiss under Rule 12(b)(6) only if a complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); *see Ashcroft v. Iqbal*, --- U.S. ----, ---- - ----, 129 S.Ct. 1937, 1949–50 (2009) (extending *Twombly* from antitrust to litigation generally and stating that a court's determination "whether a complaint states a plausible claim for relief will . . . be a context-specific task"); *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618–19 (7th Cir. 2007); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776–77 (7th Cir. 2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.

Although a facially plausible complaint need not give "detailed factual allegations," it must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964–65.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949.  These requirements ensure that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964; *see also* Fed. R. Civ. P. 8(a).  In evaluating a motion to dismiss, we must accept all well-pled allegations in the

complaint as true and draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 129 S.Ct. at 1949–50; *Thompson*, 300 F.3d at 753.

## III. ANALYSIS

In its eight-count complaint, Facebook accuses Teachbook of trademark infringement, trademark dilution, false designation of origin, and cybersquatting in violation of the Lanham Act and related federal statutes. (Compl., Counts I–III, VI.) Facebook also brings analogous common law and Illinois statutory claims. (*Id.* Counts IV–V, VII–VIII.)

Teachbook moves to dismiss the entirety of Facebook's complaint for two reasons. (Mot. & Mem.) First, Teachbook maintains that the only similarity between the FACEBOOK and TEACHBOOK marks is the suffix -BOOK, which Teachbook argues is a generic term unentitled to trademark protection. (Mem. at 8–13.) Second, Teachbook asserts that Facebook has failed to allege—and, moreover, cannot allege—that the similarity between the FACEBOOK and TEACHBOOK marks is likely to cause confusion. (*Id.* at 6–8, 13–15.) In Teachbook's view, these arguments require dismissal of the entirety of Facebook's complaint.

We consider each of these arguments in turn. We also briefly consider Facebook's trademark dilution claim. Although Teachbook contends that all of Facebook's claims will rise or fall together based on the likelihood of confusion or lack thereof, this position is incorrect as a matter of law. (*Id.* at 6.) Trademark dilution is an alternative theory to trademark infringement and does not require establishing the likelihood of confusion. Thus, we conclude by evaluating whether Facebook has stated a trademark dilution claim.

## A. Genericness

Teachbook argues that "Facebook is simply unable to allege that the lone similar element in the parties' marks—the word BOOK—is sufficiently distinctive to warrant trademark protection." (Mem. at 11.) Teachbook also relies heavily on a case from the Southern District of New York, *Le Book Publishing, Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305 (S.D.N.Y. 2005), in support of its position that the mere overlap of the word BOOK between two marks cannot give rise to a trademark infringement claim.[1] (Mem. at 8–9.) Facebook responds that Teachbook is making a "strawman argument" about Facebook's attempt to assert a trademark right in the word BOOK when "Facebook has not alleged rights in the standalone mark BOOK, but in the mark FACEBOOK as a whole." (Resp. at 1, 11.)

A trademark infringement claim under the Lanham Act has two elements. *See* 15 U.S.C.A. § 1125(a) (West 2009). First, the plaintiff must show "that its mark is protected under the Lanham Act." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043 (7th Cir. 2000). Second, the plaintiff must show "that the challenged mark is likely to cause confusion among consumers." *Id.* But a court will not reach the second element at all "until persuaded that the putative mark is sufficiently distinctive to warrant prima facie protection as a trademark." *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992).

---

[1] Teachbook also argues that Facebook has admitted that the overlapping use of the suffix -BOOK is insufficient to state a trademark claim. (Mem. at 9–11.) Teachbook's argument is based on Facebook's filing with the European trademark authority, which we have determined to be inappropriate to consider at this stage. (*Id.*) As such, we do not evaluate this argument here.

Courts considering whether a mark is "sufficiently distinctive" to warrant trademark protection evaluate the mark based on a hierarchy of classifications. *Id.* Proceeding from the least eligible for protection to the most, the hierarchy is as follows: generic, descriptive, suggestive, arbitrary, and fanciful. *Id.*; *see also Bliss Salon Day Spa v. Bliss World LLC*, 268 F.3d 494, 496 (7th Cir. 2001); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001). The Seventh Circuit has described a generic mark as "one that is commonly used as the name of a kind of goods." *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986). "Generic marks . . . designate the products themselves rather than any particular maker," and can never function as trademarks. *Id.* at 935; *Bliss Salon Day Spa*, 268 F.3d at 497. Otherwise, the owner of a generic trademark would be able to prevent competitors from informing consumers about the basic attributes of the competitors' products. *Balu Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 610 (7th Cir. 1986).

Moving up the hierarchy, a descriptive mark "is one that specifically describes a characteristic or an ingredient of a product." *Liquid Controls*, 802 F.2d at 936. Like a generic mark, a descriptive mark ordinarily may not receive trademark protection. *Id.* In some instances, however, "a descriptive mark may warrant protection if it has acquired secondary meaning." *H-D Michigan, Inc. v. Top Quality Service, Inc.*, 496 F.3d 755, 760 (7th Cir. 2007). Secondary meaning arises only if a product name becomes "uniquely associated with the original seller." *Id.* Anyone seeking trademark protection for a descriptive mark has the burden of proving that the mark has acquired such secondary meaning. *Spraying Sys.*, 975 F.2d at 393.

There is a crucial divide at this point in the hierarchy, which separates generic and descriptive marks from the last three categories of suggestive, arbitrary, and fanciful marks. The

significance of this divide stems from the fact that marks in the latter group are "inherently distinctive" and, as a result, are automatically entitled to trademark protection without any proof of acquired secondary meaning. *Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998). But the line between descriptive and suggestive marks, while legally significant, is also hard to define. In order to give clarity to this important distinction, the Seventh Circuit has employed a "degree of imagination test" articulated as the following: "If a mark imparts information directly it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Id.* (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 952 (7th Cir. 1992)). Examples of suggestive marks include "Coppertone" for sun tan lotion, "Business Week" for a publication, and "Tide" for laundry detergent. *Bliss Salon Day Spa*, 268 F.3d at 496; *Blau Plumbing, Inc.*, 781 F.2d at 609.

Lastly, resting atop the hierarchy are those marks that are arbitrary or fanciful. Arbitrary marks are those containing words or symbols in common usage but bearing no relation to the good or service underlying the mark. 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:4 (4th ed. 2011) [hereinafter "*McCarthy on Trademarks*"]. A classic example is the use of the "Apple" trademark for computers. *Bliss Salon Day Spa*, 268 F.3d at 496. Fanciful marks are those containing words or symbols "coined for the express purpose of functioning as a trademark." *McCarthy on Trademarks* § 11:4. The marks "Exxon" for gasoline and "Kodak" for film fall into this final category. *Blau Plumbing*, 781 F.2d at 609; *Bliss Salon Day Spa*, 268 F.3d at 496.

Where a particular mark falls within this hierarchy is a factual determination to be reviewed only for clear error. *Platinum Home Mortg. Corp.*, 149 F.3d at 727. The Lanham Act also creates certain presumptions when a particular mark has been registered in accordance with that statute's provisions. 15 U.S.C. § 1115(a). Specifically, a plaintiff with a trademark registered in accordance with the Lanham Act is entitled to one of two presumptions: first, that the plaintiff's registered trademark is not merely descriptive or generic; or alternatively, that if descriptive, the mark is accorded secondary meaning. *Packman*, 267 F.3d at 638; *Liquid Controls Corp.*, 802 F.2d at 936. The defendant may overcome this presumption with proof of descriptiveness or genericness, but the burden is on the defendant to make such a showing. *Packman*, 267 F.3d at 638; *Liquid Controls Corp.*, 802 F.2d at 936. Nevertheless, the Seventh Circuit has also stated that "[w]hen one portion of a composite mark is a descriptive or generic word, that feature of the mark may be of less significance in designating a source of origin." *Henri's Food Products Co. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir. 1983).

In this case, the parties dispute what the basis for Facebook's trademark infringement claim is. Facebook contends that it is suing for infringement of its FACEBOOK mark, which, according to documents attached to the complaint, has been registered in accordance with the Lanham Act. (Compl., Ex. A.) Teachbook contends that Facebook's trademark infringement claim is based on the word BOOK, which Teachbook argues is a generic component of Facebook's mark that is unentitled to trademark protection.

In support of its position, Teachbook primarily relies on the *Le Book* case from the Southern District of New York. (Mem. at 8–9, 11–13.) The plaintiff in that case was the publisher of a print directory targeted at the creative industries, namely those involved in

fashion, advertising, media and visual production.  418 F. Supp. 2d at 307.  The plaintiff's

directory bore the mark "Le Book NY."  *Id.* at 311.  The defendant produced a similar directory,

also targeted at the creative industries, under the mark "The Black Book."  *Id.*  The plaintiff

brought a claim for trademark infringement, which the defendant then moved to dismiss pursuant

to Rule 12(b)(6).  The district court granted the defendant's motion because it concluded that

"[t]he only word in common in the marks is 'Book,' which is an unregistrable component of the

mark."  *Id.*  The court based this conclusion in part on the fact that the registration of the "Le

Book" mark included a disclaimer, pursuant to 15 U.S.C. § 1056(a), specifically excluding the

word "book" from trademark protection.  *Id.* at 311–12.  Thus, the court held that "book" was a

generic component of the plaintiff's "Le Book" mark, and the defendant's use of "book" in its

own mark was not infringement.  *Id.*

Teachbook also points to other cases from this circuit in which trademark infringement

claims have failed based on the mere overlap of generic or descriptive components of marks.

(Mem. at 11–13.)  For instance, in *Spraying Systems*, the Seventh Circuit affirmed summary

judgment for the defendant even though the defendant's marks, like the plaintiff's, contained the

suffix "-jet."  975 F.2d at 389.  Both the plaintiff and the defendant used the marks in their

manufacture and sale of spray nozzles for industrial and agricultural purposes.  *Id.*  The Seventh

Circuit concluded that there was no genuine issue of material fact that the term "jet" was

descriptive.  *Id.* at 393.  The Court further concluded that the plaintiff had failed to show any

secondary meaning in the "-jet" marks connecting those marks to the plaintiff.  *Id.* at 393–95.

Teachbook also relies on the Seventh Circuit's holding in *Top Tobacco, L.P. v. North*

*Atlantic Operating Co.*, 509 F.3d 380 (2007).  (Mem. at 11–13.)  In that case, the Seventh Circuit

affirmed summary judgment for the defendant, a seller of tobacco for "roll-your-own" cigarettes, in a trademark infringement suit brought by a competitor in the roll-your-own tobacco market. 509 F.3d at 381–82.  The plaintiff marketed its tobacco with a "Top" mark that included a picture of the children's spinning toy of the same name.  *Id.*  The defendant marketed its tobacco in a canister marked "Zig-Zag" just below a picture of a soldier in the 19th Century French Zouave style of dress.  *Id.*  The defendant's canister, however, also displayed the phrase "Fresh-Top Canister."  After canvassing the multiple meanings of the word "top"—ranging from the name of the children's spinning toy to a lid to an adjective denoting superiority—the Seventh Circuit concluded that "the word 'top' is not famously distinctive 'as a designator of source' in any sensibly specified niche of tobacco products."  *Id.* at 381, 384.  The Court reasoned that "the word 'top' is too common, and too widely used to refer to the lids of packages—as well as parts of clothing ensembles, masts of ships, summits of mountains, bundles of wool used in spinning, half-innings of baseball, positions in appellate litigation (the top-side brief) and flavors of quark—to be appropriated by a single firm."  *Id.* at 383.

Teachbook's invocation of *Le Book*, *Spraying Systems*, and *Top Tobacco* does not persuade us that dismissal of Facebook's trademark infringement claim is appropriate at this stage, however.  First of all, we are not convinced that disaggregating the FACEBOOK mark and focusing on the suffix -BOOK is appropriate in this case.  The Seventh Circuit has indicated that it is sometimes appropriate to vary the weight accorded to the different components of a mark when one component may be more salient than another or when one component is generic or descriptive.  *Henri's Food Products*, 717 F.2d at 356.  But nothing in our reading of the relevant case law suggests that this splicing is mandatory, especially in light of the highly fact specific

contexts in which trademark infringement claims arise.  Here, Facebook contends that it is not asserting blanket trademark rights in the suffix -BOOK but is instead relying on the composite FACEBOOK.  (Resp. at 11.)  We accept this contention as true for the time being.  Indeed, upon initial reading, nothing about the two component parts of the FACEBOOK mark makes one more salient than the other.  Rather, it is the aggregate effect of the conjoined parts that gives the mark its distinctiveness.  And given the ubiquity Facebook claims its mark has achieved, one could reasonably infer that the choice of the TEACHBOOK mark—which, like the FACEBOOK mark, is a curt, two-syllable conjunction of otherwise unremarkable words—to offer a similar service in the same medium was no accident.  Thus, we agree with Facebook that Teachbook's attempt to make Facebook's trademark infringement claim exclusively about the suffix -BOOK is an inaccurate characterization of the complaint.

In any event, even if we were to focus exclusively on the suffix -BOOK in Facebook's and Teachbook's marks, Facebook has still made sufficient allegations to preclude a finding of genericness at this point.  As indicated, a mark or component of a mark is generic when it "designate[s] the product[] [itself] rather than any particular maker[.]" *Bliss Salon Day Spa*, 268 F.3d at 497.  In this case, Facebook is using the suffix -BOOK to offer social networking services via the internet.  Even in this age of "e-books," social networking services do not fall within the category of what one would traditionally call "books."  Thus, accepting the complaint as true, Facebook is not using the suffix -BOOK to designate the product itself and the usage is not generic.[2]

---

[2]  In its motion to stay discovery during the pendency of this motion to dismiss, Teachbook indicates that it intends to argue that the suffix -BOOK is generic "for directory and networking services."  (Dkt. No. 26 ¶ 5.)  But this argument requires proof and goes beyond the

This case is also notably different from *Le Book* and *Spraying Systems*. In *Le Book*, the connection between the plaintiff's mark and the underlying product was obvious. The "Le Book NY" mark was used to sell what was obviously a "book" in the traditional sense of a printed, bound volume. Accordingly, the defendant's use of "The Black Book" to sell another "book" in the traditional sense was thus not infringing. The same is not true here. Facebook is using the suffix -BOOK to offer social networking services. Coincidentally, so is Teachbook. Given the apparent dissimilarity between the mark and the underlying product, we cannot conclude at this point that Facebook's use of the suffix -BOOK is generic. By this same reasoning, *Spraying Systems* is also inapposite. In that case, the connection between the plaintiff's mark and the underlying product—spray nozzles capable of producing "jets" of liquid sold with marks containing the suffix "-jet"—was much more taught than here. In short, were we to narrow the focus of our inquiry to the suffix -BOOK, we would still be unable to conclude that Facebook's mark is merely generic in the context of offering social networking services on the internet.

This case is also distinguishable from *Top Tobacco* on the issue of genericness or descriptiveness. Besides the fact that the Court in *Top Tobacco* was reviewing the district court's grant of summary judgment, whereas we are only at the motion to dismiss stage, the Court in *Top Tobacco* was confronted with two distinctive uses of the same word. As the Court observed, the word "top" has many meanings, and the parties in that case were in fact relying on at least two different ones. The plaintiff used "top" in reference to the spinning toy and perhaps

---

appropriate grounds for a motion to dismiss. Facebook also points to allegations in the complaint that, thanks to its efforts, the suffix -BOOK in the internet-based social networking context is distinctive. (Resp. at 12.) Thus, whether the suffix -BOOK is generic for online "directory and networking services" can not be definitively resolved at this stage.

as a *double entendre* to suggest high quality, whereas the defendant used "top" in reference to a lid. Here, the word "book," unlike "top," does not instantly call to mind a multiplicity of meanings. Furthermore, absent a more-developed record, we have no way of knowing if the parties are using the suffix -BOOK in substantially different ways or if, as appears to be the case, they are in fact using the word in the same way. For these reasons, *Top Tobacco* also does not command dismissal.

Finally on the issue of genericness, Teachbook's motion also fails to acknowledge the presumption afforded to Facebook at this stage in the proceedings arising from the registration of the FACEBOOK mark. As indicated, Facebook has alleged in the complaint and submitted supporting documentation indicating that its FACEBOOK mark is registered in accordance with the Lanham Act. Given that we have decided to consider the mark as a whole for purposes of this motion to dismiss, the alleged registration of the FACEBOOK mark means that that mark is presumptively not generic and, at the very least, has acquired secondary meaning. Teachbook's arguing otherwise is an attempt to introduce evidence to rebut the complaint, which is impermissible at this stage. Thus, the registration of the FACEBOOK mark means that Facebook has sufficiently alleged the first element of its trademark infringement claim, namely, that the FACEBOOK mark is a protected trademark.

### B. Likelihood of Confusion

Teachbook also challenges whether Facebook has stated the second element of its trademark infringement claim. In order to establish this element, Facebook must show that Teachbook's use of the TEACHBOOK mark "is likely to cause confusion among consumers."

*Barbecue Marx*, 235 F.3d at 1043.  Courts rely on seven factors in evaluating whether the use of contested marks is likely to create confusion among consumers:

> (1) the similarity between the marks in appearance and suggestion;
> (2) the similarity of the products;
> (3) the area and manner of concurrent use;
> (4) the degree and care likely to be exercised by consumers;
> (5) the strength of the plaintiff's mark;
> (6) any actual confusion; and
> (7) the intent of the defendant to 'palm off' his product as that of another.

*AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008); *Bd. of Reg. Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc.*, No. 08-4164, slip. op. at 11 (7th Cir. Aug. 5, 2011).  The consideration of these factors requires equitable balancing, and no single factor is dispositive. *AutoZone*, 543 F.3d at 929; *Barbecue Marx*, 235 F.3d at 1044.  Nevertheless, the Seventh Circuit has treated the similarity of the marks, actual confusion, and the defendant's intent as particularly important.  *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir. 2000).  Ultimately, whether likelihood of confusion exists is a factual determination subject to review for clear error.  *AutoZone*, 543 F.3d at 1044.

Teachbook assails the complaint for what it sees as a failure to adequately plead these factors.  Specifically, Teachbook argues that "Facebook's allegation of similarity is belied by the Marks themselves" and "[a] mere glance at the two marks is all that is needed to decide this [m]otion."  (Mem. at 6–7.)  Teachbook also bemoans Facebook's failure to allege actual confusion, which, in Teachbook's view, is surprising in light of Facebook's purportedly "'enormous and loyal user base.'"  (Mem. at 13 (quoting Compl. ¶ 10.).)  Lastly, Teachbook challenges Facebook's allegation of bad intent based on the fact that "Teachbook publicly and

affirmatively distinguished its services from those of Facebook and MySpace." (*Id.* at 14.) We consider each of these arguments and Facebook's responses thereto in turn.

### 1. Similarity of the Marks

In its brief in support of its motion to dismiss, Teachbook boldly asserts: "A mere glance at the two marks is all that is needed to decide this [m]otion." (Mem. at 6.) After placing color images of the two marks on the front page of its brief, Teachbook proceeds to highlight the visual and aural differences between the FACEBOOK and TEACHBOOK marks. (*Id.* at 1, 7–8.) As Teachbook summarizes: "[i]t is undeniable that the two marks are completely different, not only in the first dominant word, but also in typeface, style, coloration, and overall commercial impression." (*Id.* at 7–8.)

Teachbook's argument channels the Seventh Circuit in *Top Tobacco*, where the Court began: "This case illustrates the power of pictures. One glance is enough to decide the appeal." 509 F.3d at 381. The Court then proceeded to compare pictures of canisters of tobacco for roll-your-own cigarettes. *Id.* at 382. In affirming the district court's grant of summary judgment for the defendant, the Seventh Circuit held that "no consumer could miss the difference" between the parties' marks, one being the word "Top" coupled with an image of the children's spinning toy and the other being the word "Zig-Zag" with an image of a soldier. *Id. Top Tobacco* stands as the boldest example of the Seventh Circuit's view that, when comparing marks for similarity, visual similarity or lack thereof plays an important, and often predominant, role. *See also Barbecue Marx*, 235 F.3d at 1044 ("Because the public will encounter the marks in written as well as spoken form, we believe it is essential to consider the marks' visual characteristics.").

But in other cases, the Seventh Circuit has broadened the inquiry beyond the visual similarity or dissimilarity of the marks. As the Seventh Circuit stated in *AutoZone*, "we must compare the marks in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." 543 F.3d at 930 (citation omitted). In that case, the Court was considering whether the defendant's use of "Oil Zone" and "Wash Zone" to offer automotive services infringed on the plaintiff's use of the famous "AutoZone" mark in the automotive products retail business. *Id.* at 926. In reversing the district court's grant of summary judgment for the defendant, the Court emphasized that "[a]ll [the] marks have 'Zone' as the second word." *Id.* at 930. And despite some visual dissimilarities, such as different coloring and markings, the Court held that "the prominent similarities between the marks may very well lead a consumer cruising down the street to believe, after driving past both parties' businesses, that Oil Zone and Wash Zone represented AutoZone's entry into the oil-change and car wash-services market." *Id.* In the same vein, in *Eli Lilly*, the Seventh Circuit affirmed a preliminary injunction for the makers of the anti-depressant drug "Prozac" against the maker of an herbal supplement called "Herbrozac." 233 F.3d at 465. The Court's analysis focused heavily on the "obvious" similarity in pronunciation and spelling between the names "Prozac" and the "Herbrozac." *Id.* at 462. The Court reasoned that, "[g]iven the strong similarity in the marks and the potential overlap in [the plaintiff's] and [the defendant's] product lines, the mere addition of the Herb prefix does not go far enough to distinguish Natural Answers' product from Prozac." *Id.* at 463.

In this case, Facebook has adequately alleged similarity between the marks based on the relevant case law. Specifically, Facebook alleges that "[t]he TEACHBOOK Mark is highly similar to the registered FACEBOOK Marks in appearance, sound, meaning, and commercial

impression." (Compl. ¶ 25.) Although Teachbook assails this allegation as "conclusory" and "pure folly," we disagree with Teachbook's characterization. (Mem. at 1.) At the very least, this allegation points to the textual and aural similarities between the two marks, which, as in *Eli Lilly*, are rather obvious. 233 F.3d at 462. Both marks are a combination of the suffix -BOOK preceded by fairly mundane, monosyllabic words. And in both instances, it is the uninterrupted conjunction of the mundane words with the suffix -BOOK that gives the marks their verve.

Furthermore, even though Teachbook makes much of the differences between the coloration and font of the marks, we think it is reasonable to infer that these aspects of the marks would matter less "in light of what happens in the marketplace" that is relevant to this case. *AutoZone*, 543 F.3d at 930. This case involves internet websites, not consumer goods sitting next to each other on a store shelf, as was the case in *Top Tobacco*. 509 F.3d at 380. The textual and aural similarities between the marks are likely to matter more in a market setting where potential customers will be attracted through word-of-mouth, hyperlinks, and search engine results. Given the similarities between the TEACHBOOK and FACEBOOK marks, it is reasonable to infer that someone browsing the internet might understand Teachbook to be "in some way related to, or connected or affiliated with, or sponsored by" Facebook. *AutoZone*, 543 F.3d at 930. Thus, drawing all reasonable inferences in the plaintiff's favor, Facebook has adequately alleged similarity between the marks at issue.

### 2. Actual Confusion

Teachbook also criticizes Facebook for failing to allege actual confusion. (Mem. at 13–14.) Teachbook views this omission as particularly glaring in light of Facebook's claim to have an "enormous and loyal user base." (Mem. at 13 (quoting Compl. ¶ 13).) But Teachbook's

insistence on an allegation of actual confusion is contrary to what is required to state a trademark

infringement claim.  As the Seventh Circuit has made clear, "[n]o single factor is dispositive" in

evaluating the likelihood of confusion.  *AutoZone*, 543 F.3d at 929.  And even though actual

confusion is one of three factors upon which courts place particular emphasis, the absence of

actual confusion is not fatal to an infringement claim.  *See Sands, Taylor & Wood*, 978 F.2d at

960 ("As we have stated many times . . . the plaintiff need not show actual confusion in order to

establish *likelihood* of confusion.") (emphasis in original); *see also CAE, Inc. v. Clean Air

Eng'g, Inc.*, 267 F.3d 660, 686 (7th Cir. 2001) (citing *Sands, Taylor & Wood*); *Eli Lilly*, 233 F.3d

at 465.  Thus, Facebook's failure to allege actual confusion arising from the similarity of the

TEACHBOOK and FACEBOOK marks does not mandate dismissal.

### 3.  Intent

Teachbook argues that Facebook has failed to adequately plead Teachbook's intent to

"palm off" its services as those of Facebook.  (Mem. at 14.)  In fact, Teachbook points to

allegations in the complaint indicating that Teachbook, on its own website, "publicly and

affirmatively distinguished its services from those of Facebook and My Space." (*Id.*)  In

Teachbook's view, "*distinguishing* another product or service is the *opposite* of intending to

palm off."  (*Id.* (emphasis in original).)  Thus, based on the supposedly contradictory allegations

in the complaint, Teachbook maintains that Facebook has not sufficiently alleged an intent to

confuse consumers.

Before evaluating the intent allegations in the complaint, it is important to identify what

suffices as "bad intent" for trademark infringement purposes, particularly in cases involving the

internet.  *Eli Lilly* is especially instructive on this point.  As indicated, that case involved a

-26-

dispute between the maker of the drug "Prozac" and the maker of an herbal supplement "Herbrozac." 233 F.3d at 459. In affirming a preliminary injunction for the maker of "Prozac," the Seventh Circuit found that the evidence of wrongful intent was "so obvious" that the factor deserved to be weighed heavily in the plaintiff's favor. 233 F.3d at 465. There were two facts in the Court's view that were crucial to the issue of intent. First, the defendant had admitted "that the name Herbrozac was coined to remind consumers of Prozac," a name which, in the Seventh Circuit's view, had achieved "extraordinary fame." *Id.* at 465, 466 n.5. Second, the source code of the defendant's website included references to "Prozac." *Id.* at 465. Regarding the source code references, the Seventh Circuit concluded: "[t]he clear intent of this effort, whether or not it was successful, was to divert [i]nternet users searching for information on Prozac to [the defendant's] [w]eb site." *Id.* Significantly, the Court viewed the evidence of bad intent as strong despite the defendant's evidence that its website, which was the only place Herbrozac was advertized, "ma[de] clear that the product [was] not associated with [the plaintiff]." *Id.* at 464.

The facts alleged in the complaint here, if true, are similar to those in *Eli Lilly*. As was true with the maker of "Prozac" in *Eli Lilly*, Facebook alleges that its marks have achieved significant fame in part as a result of "extensive and continuous media coverage." (Compl. ¶ 10.) Facebook also contends that "[Teachbook] adopted the TEACHBOOK Mark with knowledge of, and the intent to call to mind and create a likelihood of confusion with regard to, and/or trade off the fame of Facebook and the registered FACEBOOK marks." (*Id.* ¶ 28.) In essence, Facebook, through this allegation, is promising to prove what the plaintiff in *Eli Lilly* successfully proved: "that the name [TEACHBOOK] was coined to remind consumers of

[FACEBOOK]." 233 F.3d at 465. Thus, on first blush, Facebook's allegations of bad intent clearly pass muster.

But Teachbook points to other allegations in the complaint that it claims undermine Facebook's allegation of bad intent. Specifically, Teachbook points to Facebook's inclusion of the following statement from Teachbook's website in the complaint:

> Many schools forbid their teachers to maintain Facebook and MySpace accounts because of the danger that students might learn personal information about their teachers. With Teachbook, you can manage your profile so that only other teachers and/or school administrators can see your personal information, blogs, posts, and so on. Teachbook is all about community, utility, and communication for teachers.

(Compl. ¶ 13.) According to Facebook, this statement evidences Teachbook's attempt to offer itself as "a substitute for Facebook." (*Id.*) But in Teachbook's view, this statement demonstrates Teachbook's attempt to distinguish itself from Facebook, which it contends "is the *opposite* of intending to palm off." (Mem. at 14 (emphasis in original).)

We do not view the statement from Teachbook's website as contradictory to Facebook's allegation of bad intent. Again, the situation is analogous to *Eli Lilly*. There, the defendant promoted its herbal supplement "Herbrozac" as an alternative to "Prozac" and disclaimed association with the maker of "Prozac" on its website. Nevertheless, the Seventh Circuit concluded that, even though the defendant was offering an alternative to "Prozac," it was doing so by unfairly invoking the fame of the "Prozac" name and attempting "to divert [i]nternet users searching for information on Prozac to [the defendant's] [w]eb site." 233 F.3d at 465. It is reasonable to infer from the complaint that the same thing may be happening here, albeit with website domain names rather than meta tags. Indeed, one can imagine teachers searching the internet for www.facebook.com and hitting upon www.teachbook.com. And even though these

-28-

same teachers might also read Teachbook's attempt to define itself as an alternative to Facebook, the initial interest stems from the goodwill associated with Facebook, not Teachbook. *See Eli Lilly*, 233 F.3d at 465 (finding that "initial interest confusion" is actionable under the Lanham Act and defining it as "when a consumer is lured to a product by its similarity to a known mark, even though the consumer realizes the true identity and origin of the product before consummating a purchase"); *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002) ("That consumers who are misled to [the defendant's] website are only briefly confused is of little or no consequence . . . What is important is not the duration of the confusion, it is the misappropriation of [the plaintiff's] goodwill.").

Furthermore, who is to say these teachers might not think that Teachbook is Facebook's response to some schools banning teachers from using Facebook? In light of such policies, a reasonable consumer might assume that Facebook was offering social networking services targeted specifically at teachers and addressing the privacy concerns at which the schools' policies are apparently aimed. The same consumer might further assume that Facebook, in order to draw on its famous name, decided to call that service TEACHBOOK. Indeed, nothing in the statement from Teachbook's website indicates that this is not the case. Thus, nothing in Facebook's complaint undermines its allegation that Teachbook intends "to mislead consumers into believing that [Teachbook] is somehow affiliated with [Facebook]." *AutoZone*, 543 F.3d at 934.

### 4. Other Factors

Teachbook's arguments regarding the likelihood of confusion focus primarily on three factors: similarity, actual confusion, and intent. As discussed, the allegations in the complaint,

taken as true, establish that at least two of these factors weigh in Facebook's favor. Teachbook also largely fails to acknowledge the remaining factors, many of which are clearly alleged in the complaint.

Specifically, Facebook has adequately alleged that Teachbook and Facebook are offering similar products. According to the complaint, both Facebook and Teachbook operate social networking websites. (Compl. ¶¶ 6, 13.) Teachbook maintains that it is not competing with Facebook, given that its targeted consumers are teachers, some of whom are not allowed to use Facebook. (Reply at 11–12.) But Facebook is alleging that Teachbook is offering itself as a "substitute for Facebook" in light of policies banning teachers from using Facebook. (Compl. ¶ 13.) Recognizing the line Teachbook purports to draw could mean the carving up of Facebook's potential user base in to subgroups based on employers' anti-Facebook policies. Facebook would understandably like to avoid such a scenario. Thus, Facebook has adequately alleged that Teachbook is offering a similar product.

Facebook has also adequately alleged that "the area and manner of concurrent use" of the marks are the same. The complaint states that "[b]oth Facebook and [Teachbook] offer their services through the same channel of trade, i.e., the internet." (*Id.* ¶ 27.) And as indicated above, Facebook alleges that its FACEBOOK marks have achieved substantial fame. (*Id.* ¶ 10–11.) This allegation, if true, would demonstrate that the marks upon which Facebook brings its claim are strong. Based on our reading, the complaint is largely silent as to the degree and care likely to be exercised by consumers. Given Facebook's numerous allegations relating to the other factors, however, the absence of this factor is of no moment for our present purposes.

-30-

In all, Facebook has alleged that five of the seven factors courts use to determine the likelihood of confusion in trademark infringement claims are present in this case. In view of the fact that the seven-factor test requires equitable balancing and not all of the factors need to be present, Facebook's allegations are sufficient to state a claim for trademark infringement. Accordingly, Teachbook's motion is denied with respect to Count I. Furthermore, because Teachbook assumed the position in its motion and supporting briefs that all of Facebook's claims would stand or fall with the trademark infringement claim (Mem. at 6, 15), Teachbook's motion is also denied with respect to Counts III through VIII. We briefly address Count II, Facebook's trademark dilution claim, below.

### C. Trademark Dilution

Teachbook argues that "[a]ll of Facebook's claims demand that there is a confusing similarity of some distinctive feature of the parties' marks." (Mem. at 6.) While Teachbook is correct that Facebook must show similarity between its marks and Teachbook's, Facebook need not prove "*confusing* similarity" to sustain a trademark dilution claim.[3] In order to establish its

---

[3] As discussed above, we have already determined that Facebook has adequately alleged similarity between its marks and Teachbook's. In its reply, however, Teachbook suggests that the degree of similarity required to establish a trademark dilution claim is higher than that which is required for a trademark infringement claim. (Reply at 14.) We do not think that this contention is true. Indeed, at least one circuit court, the Ninth Circuit, has rejected a heightened standard of similarity for trademark dilution claims. In rejecting the district court's application of an "identical or nearly identical" standard to a trademark dilution claim, the Ninth Circuit recognized that Congress, in passing the Trademark Dilution Revision Act of 2006, Pub. L. 109-312, 120 Stat. 1730, did not intend to require heightened similarity. *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1172 (9th Cir. 2011) (Ripple, J.). As the Court summarized: "[T]he plain language of 15 U.S.C. § 1125© does not require that a plaintiff establish that the junior mark is identical, nearly identical or substantially similar to the senior mark in order to obtain injunctive relief. Rather, a plaintiff must show, based on the factors set forth in § 1125(c)(2)(B), including the degree of similarity, that a junior mark is likely to impair the distinctiveness of the famous mark." *Id.*

trademark dilution claim, Facebook must show that: (1) its marks are famous; (2) Teachbook adopted its mark after Facebook's marks became famous; (3) Teachbook's mark is likely to cause dilution of Facebook's marks; and (4) Teachbook is using its mark in commerce for commercial purposes. *Eli Lilly*, 233 F.3d at 466; 15 U.S.C.A. § 1125© (West 2009). None of these factors require Facebook to show actual or likely confusion arising from Teachbook's use of the mark at issue. Instead, a trademark dilution claim is an alternative to a traditional trademark infringement claim. *McCarthy on Trademarks* § 24:69.

For a traditional trademark infringement claim, the harm to be remedied is the possible deception of consumers through the use of similar or identical trademarks. The paradigmatic trademark infringement claim arises when consumers seeking to obtain goods or services from one source—that is, the owner of a particular trademark—instead obtain them from another source while thinking the goods or services are from the first source due to confusingly similar trademarks. In other words, trademark infringement claims protect against a harm akin to fraud. *Id.* § 24:72.

For a trademark dilution claim, however, the harm is not based on the potential for consumer confusion. A trademark dilution claim can still arise where consumers have not been and are not likely to be confused about the source of goods or services offered under the same or similar trademarks. Rather, a trademark dilution claim—and specifically one that relies on a theory of dilution by "blurring," as is alleged here (Compl. ¶ 38)—stems from a trademark losing its ability to trigger an association in consumers' minds between the trademark and a particular producer of goods or services. *McCarthy on Trademarks* § 24:69. For instance, as

one commentator hypothesizes, Tiffany's, the famous jewelry store, might have a trademark dilution claim against a new restaurant named Tiffany's.  *Id.*  The harm in that case would not be related to customer confusion, because reasonable consumers would be capable of distinguishing between Tiffany's the jewelry store and Tiffany's the restaurant.  Instead, the harm would arise from the diminished ability of the Tiffany's trademark to trigger an association with the purveyor of high-end jewelry.  *Id.*  In this way, the harm in the trademark dilution context has been described as akin to trespass, whereby the trademark owner's property right in the trademark undergoes a "gradual whittling away."  *Id.* § 24:72.

Thus, despite what Teachbook says, not all of Facebook's claims turn on the likelihood of consumer confusion.  Rather, Facebook's trademark dilution claim presents an alternative avenue for relief even if Facebook is unable to prove the likelihood of confusion necessary to sustain its trademark infringement and related claims.  The allegations in the complaint are also sufficient to state a claim for trademark dilution.  Specifically, Facebook avers that its marks are famous within the meaning of the trademark dilution statute (Compl. ¶ 10 (citing 15 U.S.C. § 1125(c)) and that they became so prior to Teachbook's adoption of the TEACHBOOK mark (*Id.* ¶ 37).  Facebook also alleges that Teachbook's use of the TEACHBOOK mark "impairs the distinctiveness of the FACEBOOK Marks and weakens the connection in consumers' minds between the Facebook Marks and Facebook's services."  (*Id.* ¶ 38.)  Lastly, Facebook states that Teachbook is using its mark "in connection with a business and online website."  (*Id.* ¶ 12.)  These allegations are sufficient to state a claim for trademark dilution.  Accordingly, Teachbook's motion to dismiss Count II is denied.

## IV.  CONCLUSION

Teachbook's motion to dismiss the complaint is denied as to all counts.  It is so ordered.


_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Date: September 26, 2011